# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Hamed Salimabadi,

      Petitioner

v.

Kristi Noem, et al.,

      Respondents

Case No.: 2:25-cv-02508-JAD-DJA

**Order Granting Preliminary Injunction
and Directing Release of Detainee**

[ECF No. 5]

Petitioner Hamed Salimabadi was admitted to the United States as a lawful permanent resident in 1999 but later ordered removed to Iran, his country of origin, in 2006. The United States was unable to secure Salimabadi's removal in 2006 and again after detaining him for six months in 2010, so he has been living in this country at liberty and under an order of supervision issued by the Department of Homeland Security. But on June 25, 2025, Immigration and Customs Enforcement (ICE) officials arrested Salimabadi, and he has been detained at the Nevada Southern Detention Center ever since. In December 2025, Salimabadi filed a petition for a writ of habeas corpus seeking his immediate release from custody, as well as an emergency motion for a temporary restraining order (TRO) for his release pending a decision on the habeas petition. He contends that his prolonged detention and the government's failure to provide notice before effectively revoking his supervision order exceed the government's statutory authority and violate his constitutional due-process rights. This court held a hearing on Salimabadi's TRO motion on Friday, January 9, 2026.

I convert Salimabadi's motion to one for a preliminary injunction, and I grant it. Salimabadi has shown a likelihood of success on the merits of his claim that his prolonged detention exceeds the government's statutory authority under the United States Supreme Court's

opinion in *Zadvydas v. Davis*[1] and that he will suffer continued irreparable harm if he is not released.  So I direct the respondents to secure his immediate release, subject to reasonable conditions of supervision set forth in 8 U.S.C. § 1231(a)(3).  I do not require that Salimabadi post a bond securing his release.

## Background

Hamed Salimabadi is an Iranian citizen and was admitted to the United States as a lawful permanent resident in 1999 when he was approximately two years old.[2]  He was ordered removed in 2006 and was released under an order of supervision because his removal could not be effectuated.[3]  Salimabadi was detained by ICE a second time in 2010 and was held for more than 180 days before again the federal government again released him on an order of supervision.[4]  At some point during that detention, Salimabadi had a phone call with an Iranian consular officer who "explicitly refused to issue [him] any travel documents and informed him that Iran would not recognize him as an Iranian national for purposes of repatriation."[5]

Salimabadi remained at liberty for the next 15 years, through three different administrations.  But on June 25, 2025, ICE arrested and detained him for a third time.  He alleges that he was detained as part of a concerted ICE effort to "round up all Iranians" following

---

[1] *Zadvydas v. Davis*, 533 U.S. 678 (2001).

[2] ECF No. 1 at ¶ 42.

[3] *Id.* at ¶ 44.

[4] *Id.* at ¶ 45.

[5] *Id.* at ¶ 46.

United States' military operations in Iran.[6]  He also recounts that he was told by an ICE officer that the officer "was unsure why he was being detained"[7] because Iran wouldn't accept him.[8]

The government asserts that Salimabadi was arrested under a "warrant of removal/deportation" that it provided as an exhibit to its response to his TRO motion.[9]  That document claims that he was taken into custody under "241(a)(5) of the INA."[10]  That provision is codified as 8 U.S.C. § 1231(a)(5), which permits the reinstatement of removal orders against noncitizens who were deported or voluntarily left the United States, then illegally returned.[11]  At the hearing on Salimabadi's TRO motion, the government conceded that this provision does not apply to Salimabadi.  The warrant also uses Salimabadi's name four times, and each iteration is spelled differently—and wrong.[12]  Although the government claims that Salimabadi violated his conditions of supervision by failing to affirmatively seek documents that would secure his removal to Iran, it has produced no evidence supporting that narrative or showing that his supervision was revoked for that reason.

**Discussion**

**A.    This court has jurisdiction to order relief related to Salimabadi's habeas petition.**

The constitution provides that the writ of habeas corpus is "available to every individual detained in the United States."[13]  That writ permits a person who is in custody to challenge the

---

[6] *Id.* at ¶ 48.

[7] *Id.*

[8] ECF No. 1-1 at ¶ 17.

[9] ECF No. 9 at 3; ECF No. 9-4.

[10] ECF No. 9-4.

[11] 8 U.S.C. § 1231(a)(5).

[12] *See* ECF No. 9-4.

[13] *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art 1, § 9, cl. 2).

legality of his detention, and the court has the authority to release the petitioner if it determines that the petitioner is illegally detained.  The court's habeas jurisdiction encompasses a noncitizen's challenge to his detention under the United States's immigration laws.[14]

**B.     This nation's immigration laws permit a noncitizen's detention pending removal, but that detention period should not exceed six months without a significant likelihood of removal in the reasonably foreseeable future.**

*1.      The government has authority to detain noncitizens after they have been ordered removed.*

The Immigration and Nationality Act (INA) and its implementing regulations establish a complex set of rules governing the government's authority to arrest, detain, order removed, and deport noncitizens.  8 U.S.C. § 1231(a) governs the detention of noncitizens who have been ordered removed.  It establishes a 90-day "removal period" that begins on "(i) the date the order of removal becomes administratively final, (ii) if the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order," or the date the noncitizen is released from non-immigration detention.[15]  During that 90-day period, detention is mandatory.[16]  The statute gives the government the ability to detain a noncitizen beyond that removal period under § 1231(a)(6) if he is inadmissible, removable "as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy,"[17] or has been determined "to be a risk to the community or unlikely to comply

---

[14] *Zadvydas*, 533 U.S. at 687; *Demore v. Kim*, 538 U.S. 510, 517 (2003).

[15] 8 U.S.C. § 1231(a)(1)(B).

[16] 8 U.S.C. § 1231(a)(2)(A).

[17] *Zadvydas*, 533 U.S. at 682.

4

1  with the order of removal."[18]  If those conditions aren't met, the government may release the

2  noncitizen "subject to certain terms of supervision."[19]

3

4    **2.    The due-process clause of the U.S. Constitution prohibits the government from indefinitely detaining noncitizens pending removal.**

5    Section 1231(a)(6) does not limit the length of time that a noncitizen may be held post-

6  removal period.  But in *Zadvydas v. Davis*, the United States Supreme Court rejected the

7  government's contention that noncitizens can be held indefinitely under § 1231(a)(6) because

8  that interpretation "would raise a serious constitutional problem" under the Fifth Amendment's

9  due-process clause.[20]  To avoid its constitutional concerns, the High Court interpreted the statute

10 to permit continued detention only if a noncitizen's removal is "reasonably foreseeable."[21]  It

11 determined that six months of post-removal-period detention is presumptively reasonable.[22]  But

12 after six months, the noncitizen must "provide[] good reason to believe that there is no

13 significant likelihood of removal in the reasonably foreseeable future" to show that his prolonged

14 detention exceeds the government's statutory authority and that he should be released from ICE

15 custody.[23]  If the noncitizen meets that burden, "the government must respond with evidence

16 sufficient to rebut that showing."[24]  And as "the period of prior post-removal confinement grows,

17 what counts as the 'reasonably foreseeable future' conversely would have to shrink."[25]

18

_____

19   [18] 8 U.S.C. § 1231(a)(6).

     [19] *Zadvydas*, 533 U.S. at 682 (quoting 8 U.S.C. § 1231(a)(6)) (cleaned up).

20   [20] *Id.* at 690.

21   [21] *Id.* at 699.

     [22] *Id.* at 701.

22   [23] *Id.*

23   [24] *Id.*

     [25] *Id.* (cleaned up).

**C.      TROs and preliminary injunctions require a showing that the petitioner is likely to succeed on the merits of his claims and will suffer irreparable harm if relief is not granted.**

A temporary restraining order or preliminary injunction is an "extraordinary" remedy "never awarded as of right."[26]  The Supreme Court clarified in *Winter v. Natural Resources Defense Council, Inc.* that, to obtain an injunction, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable injury in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."[27]  The Ninth Circuit recognizes an additional standard: if "plaintiff[s] can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiffs' favor,' and the other two *Winter* factors are satisfied."[28]  Under either approach, the starting point is a merits analysis.[29]

The respondents were given notice of Salimabadi's TRO motion, as well as an opportunity to respond and to be heard at an in-person hearing.  I thus sua sponte convert the

---

[26] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[27] *Id.* at 20.

[28] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

[29] The government contends that petitioner seeks mandatory injunctive relief and thus faces a heightened burden.  ECF No. 9 at 9.  But temporary restraining orders are meant to preserve the status quo, which "refers to the legally relevant relationship between the parties before the controversy arose."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (citing *McCormack v. Hiedeman*, 694 F.3d 1004, 1020 (9th Cir. 2012)).  In cases like this, the status quo is the petitioner's "physical presence in the United States free from detention." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 718 (W.D. Wash. Aug. 21, 2025) (collecting cases that have rejected the government's mandatory-injunction arguments in similar situations).  I agree with the many district courts that have determined that the relief sought here—release on the supervision conditions similar to those that the petitioner was under prior to his re-detention— preserves the status quo.  So I do not apply the heightened standard for mandatory injunctive relief.

motion into one for a preliminary injunction.[30]  The standard for both forms of relief is the same, the parties were given notice and a hearing, and the nature of the relief granted by this case is more properly addressed by a preliminary injunction.

**D.**      **Salimabadi has shown that he is likely to succeed on his prolonged-detention claim.**

> *1.*      ***Salimabadi has provided good reasons to believe that he will not be removed in the reasonably foreseeable future.***

Salimabadi has shown a likelihood of success on his prolonged-detention claim.  The parties agree that Salimabadi has been detained for longer than six months, taking this case out of the presumptively reasonable period of detention established by *Zadvydas*.[31]  So Salimabadi bears the initial burden of showing that there are "good reasons to believe that that there is no significant likelihood of removal in the reasonably foreseeable future."[32]

Salimbadi has been in ICE's custody for at least six months now, but it appears that he was also in ICE custody under his final removal order for at least 180 days sometime around

---

[30] *See* Fed. R. Civ. P. 65 (distinguishing between a temporary restraining order and a preliminary injunction based on notice and the responding party's ability to be heard).

[31] The parties disagree over whether Salimabadi's post-removal detention periods in 2006 and 2010 should count toward the *Zadvydas* calculus.  Many courts have found that prior detention periods must be considered; otherwise, the government could detain, release, and re-detain noncitizens ad nauseam without technically violating *Zadvydas*.  *See, e.g.*, *Shalala v. Mattos*, 2025 WL 3568234, at * 6 (D. Nev. Dec. 14, 2025) (considering the "full amount of time that Petitioner has spent in immigration detention since he was ordered removed" because "[o]therwise, the government could simply circumvent the INA by releasing and re-detaining citizens such that they never reach six months of continuous detention"); *Nguyen v. Scott*, 796 F. Supp. 703, 722 (W.D. Was. 2025) (noting that, "under the reasoning of *Zadvydas*, a series of releases and re-detentions by the government . . . in essence results in an indefinite period of detention, albeit executed in successive six-month intervals").  Because Salimabadi's current detention exceeds the six-month threshold and I find that the government has not shown that he will be removed in the reasonably foreseeable future even when considering that his detention has not yet extended too far beyond that presumptively reasonable period, I need not and do not address this issue here.

[32] *Id.* at 701.

2010.[33]  He was ordered removed in 2006, and ICE has been unable to remove him for approximately *two decades*.  Salimabadi also alleges that he has been told by an Iranian consulate officer that he will not be recognized as an Iranian national for repatriation purposes.[34] And he alleges that an ICE field officer told him after his 2025 arrest that he didn't know why Salimabadi was arrested and that Iran wouldn't accept him.[35]  From these facts I can conclude that Salimabadi is likely to succeed in showing that he has good reasons to believe he will not be removed any time soon.[36]

### 2.    *The government's assertions that Iran is accepting U.S. deportees are unsupported by any evidence.*

The government utterly fails to meet its shifted burden to "respond with evidence"[37] rebutting Salimabadi's showing.  Its attorneys state without any support that "[r]ecent developments between the Iranian and United States government shows [sic] that Iran has

---

[33] The government did not confirm or deny that Salimabadi was in ICE custody at that time.  But Salimabadi alleges in his verified complaint that he was, and the government submitted an exhibit showing that he received a new supervision order in 2011, adding credence to his allegations.  *See* ECF No. 9-3 at 4 (order of supervision addendum dated October 4, 2011).

[34] ECF No. 1 at ¶ 46.  At the hearing, counsel for Salimabadi represented that this conversation happened while Salimabadi was in ICE custody around 2009.

[35] *See* ECF No. 1-1 at ¶ 17.

[36] The government contends that Salimabadi's claims are based purely on speculation.  ECF No. 9 at 11–12.  Not so.  His verified allegations stem from hard truths—like ICE's inability to secure his removal for two decades—and statements made to him by Iranian officials and ICE field agents indicating that his removal is unlikely or impossible.  The government fails to meaningfully address those facts—let alone rebut them.

[37] *Zadvydas*, 533 U.S. at 701.

8

accepted approximately 100 Iranian citizens who have been deported by the United States."[38] But that statement is not supported by any evidence.[39]

But even if I accepted the government's attorney's statement as true, it does not meet the government's burden to show that there is a significant likelihood that Salimabadi will be removed in the reasonably foreseeable future. The fact that Iran has accepted some deportations does not show that it will continue to do so, nor that it has reconsidered its previous conclusion that Salimabadi would not be considered an Iranian national for repatriation purposes. So even if Iran has accepted some deportations, the government has failed to provide any indication that it would accept *Salimabadi's*.

> ### 3. The government's unsupported assertions that Salimabadi has failed to assist in effectuating his deportation are insufficient to show that the delay in removal is Salimabadi's fault.

The government also contends that Salimabadi was arrested and has not been removed because he has not been making good-faith efforts to obtain travel documents from Iran.[40] It

---

[38] ECF No. 9 at 12.

[39] At the hearing, respondents' counsel relied on a BBC article that was attached to its filings in a different case. That article does not constitute competent evidence. It reports that Tehran officials confirmed that "a chartered plane carrying more than 50 Iranians" departed from the United States to Iran. Khashayar Joneidi, *US deports second group of Iranian nationals, officials say*, BBC (Dec. 8, 2025) https://www.bbc.com/news/articles/c23e77ln3d1o. But it also says that "US immigrations officials could not 'confirm or deny a flight' for security reasons." *Id.* And even if I accept that this flight occurred, nothing in this article provides me with evidence that Iran and the United States have "reopened diplomatic relations" as the government suggested at the hearing. Nor does it provide support for the implied argument that, because Iran accepted 50 deportees, it will accept even more, and one of those future deportees will be Salimabadi.

[40] The government argues that Salimabadi's arrest was proper because failing to affirmatively seek removal documents violated his conditions of supervision. As discussed at length at the hearing on this matter, that argument appears specious for several reasons, the chief ones among them that (1) the orders of supervision that the government attached to its response do not appear to require Salimabadi to affirmatively seek travel documents when he wasn't asked to assist immigration officials with those efforts, *see* ECF No. 9-3, and (2) no evidence suggests that his release was formally revoked for that reason or that he was informed that this was the reason he

1    claims that, "[a]fter 23 years since his final removal order, there does not appear to be any

2    indication that [Salimabadi] has made any efforts to obtain" those documents.[41]   At the hearing,

3    the government implied that ICE cannot start making efforts to remove Salimabadi without his

4    affirmative assistance.

5            The Ninth Circuit has affirmed the denial of habeas petitions when ICE showed that a

6    noncitizen refused to fill out a passport application or took other steps to thwart removal

7    efforts.[42]   But the government could provide no evidence of any such refusal to cooperate in this

8    case.   It offers only the unsupported assertion that Salimabadi didn't provide any evidence

9    showing that he independently sought his own removal.   Plus, Salimabadi's counsel represented

10   that Salimabadi arrived in the United States as an infant, the only Iranian documentation of his

11   citizenship that he had was a birth certificate, and he gave that birth certificate to ICE officials

12   when he was first detained in 2006.   The government has provided no support for the contention

13   that he should have been doing something more, or that doing something more was required by

14   his order of supervision.   Nor does it meaningfully respond to Salimabadi's allegation that he did

15   speak to an Iranian consular official in 2010 in an effort to obtain documents and was told that he

16   would not be accepted in Iran.   So I find that Salimabadi has shown good reasons to believe that

17

18   ─────────────────────
     was arrested.   But I do not address this argument further because I do not reach Salimabadi's
19   contention that he is entitled to preliminary relief based on the government's failure to properly
     revoke his release.

20   [41] ECF No. 9 at 3.

21   [42] *See, e.g.*, *Pelich v. I.N.S.*, 329 F.3d 1057, 1059 (9th Cir. 2003) (affirming the denial of habeas
     relief for a noncitizen who refused to fill out a passport application to his home country, noting
22   that the noncitizen "himself is responsible for his plight"); *Lema v. I.N.S.*, 341 F.3d 853, 856 (9th
     Cir. 2003) (holding that, "when a[ noncitizen] refuses to cooperate fully and honestly with
23   officials to secure travel documents from a foreign government, the [noncitizen] cannot meet his
     or her burden to show [that] there is no significant likelihood of removal in the reasonably
     foreseeable future").

he will not be removed in the reasonably foreseeable future, and the government has failed to rebut that showing.  Because Salimabadi has shown a likelihood of success on his prolonged-detention claim, and that's enough to satisfy this element, I do not address his remaining claims.

**E.    Salimabadi has established irreparable harm.**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"[43]  The Ninth Circuit has also recognized that "unlawful detention certainly constitutes extreme or very serious" injury that "is not compensable in damages."[44] The government argues that Salimabadi hasn't shown irreparable harm because his detention is lawful.[45]  But as discussed supra, Salimabadi is likely to succeed on his unlawful-detention claim, so that argument has no merit.  I find that Salimabadi's continued deprivation of liberty and the violation of his due-process rights establish that he will continue to suffer irreparable harm if he is not released from custody.

**F.    The balance of equities and public interest tip sharply in Salimabadi's favor.**

The last two *Winter* factors merge when the government is the opposing party.[46] Salimabadi has shown that the harm of his continued deprivation sharply outweighs the government's minimal hardship caused by releasing him under conditions of supervision like those that he has been subject to for years.  The government's interest in enforcing immigration

---

[43] *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[44] *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (cleaned up).

[45] ECF No. 9 at 14–15.

[46] *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

1  laws does not tip the scales for the government, especially when the petitioner has shown that his

2  immigration detention is likely unlawful.[47]

3  **G.      The court declines to impose a bond requirement.**

4          "Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive

5  relief 'only if the movant gives security in an amount that the court considers proper to pay the

6  costs and damages sustained by the party found to have been wrongfully enjoined or

7  restrained.'"[48]  "Despite the seemingly mandatory language, Rule 65(c) invests the district court

8  with discretion as to the amount of security required, if any."[49]  Salimabadi asks the court to

9  waive any bond requirement "because the requested injunctive relief poses no realistic risk of

10  monetary harm to Respondents."[50]  The government seeks security because the President issued

11  a memo requiring federal agencies to do so "when confronted with suits seeking emergency

12  preliminary injunctive relief."[51]  Because the government does not provide any argument

13  concerning costs and damages it might sustain, and I am convinced that it will not incur any such

14  damages if it was wrongfully enjoined, I join the growing number of courts that decline to

15  require a bond in cases like this.[52]

16

17

18

---

19  [47] *See Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022) (recognizing that "neither equity nor
20  the public's interest are furthered by allowing violations of federal law to continue").

    [48] *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting Fed. R. Civ. P. 65(c)).

21  [49] *Id.* (cleaned up).

22  [50] ECF No. 5 at 14.

    [51] ECF No. 9 at 16.

23  [52] *See Bunnell v. Noem*, 2025 WL 3707588, at *9 (D. Nev. Dec. 22, 2025) (collecting cases in
    which "[c]ourts regularly waive security in cases like this one").

**Conclusion**

IT IS THEREFORE ORDERED that petitioner Hamed Salimabadi's emergency motion for a temporary restraining order **[ECF No. 5]** is converted to a motion for a preliminary injunction and **is GRANTED. Petitioner Salimabadi must be released from detention immediately under reasonable terms of supervision set forth in 8 U.S.C. § 1231(a)(3).** Determining reasonable terms of supervision must not impede the immediate release of the petitioner.

IT IS FURTHER ORDERED that respondents must **file** and **serve** on defense counsel:

(1) notice of the date, time, and location of Salimabadi's release at least 24 hours before the release is set to occur so that arrangements for his travel can be made.

(2) notice that Salimabadi's release was effectuated within three days of this order.

IT IS FURTHER ORDERED that this injunction will remain in effect, absent a successful motion to modify or dissolve it, until this court issues a final decision on the petitioner's habeas petition.

 IT IS FURTHER ORDERED that counsel for respondents are directed to immediately provide notice of this order to the restrained parties they represent.

The Clerk of Court is directed to SEND a copy of this order to the Warden of Nevada Southern Detention Center in Pahrump, Nevada.

_____
U.S. District Judge Jennifer A. Dorsey
January 13, 2026

13